## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 0:16-cv-60693-UU

THERMOLIFE INTERNATIONAL, LLC
 *et al.*,

      Plaintiffs,

v.

VITAL PHARMACEUTICALS, INC.
d/b/a VPX,

      Defendant.

_____/

### ORDER ON *MARKMAN* HEARING

THIS CAUSE is before the Court upon the *Markman* Hearing, held in this Court on Wednesday, January 4, 2017, at 10:30 a.m. On November 4, 2016, the parties filed a Joint Claim Construction and Prehearing Statement, D.E. 43. The parties filed Initial Claim Construction Briefs on November 14, 2016, D.E. 46 and D.E. 47, and filed Responses on December 2, 2016, D.E. 59 and D.E. 60. On January 3, 2017, Defendant filed a notice attaching excerpts from the December 28, 2016 deposition of Plaintiffs' expert, Dr. Richard Chamberlin. D.E. 72. On January 6, 2017, after the *Markman* Hearing and with leave of Court, Plaintiffs filed a supplemental memorandum attaching excerpts from the deposition of Dr. Chamberlin and the complete *Moinet* patent, U.S. Patent No. 6,518,458, which both parties contend to be relevant to claim construction. D.E. 73.

THE COURT has considered the parties' filings and arguments, pertinent portions of the record, and is otherwise fully advised in the premises.

## I.   <u>Background</u>

This action stems from Defendant's alleged infringement of United States Patent No. 8,350,077, entitled "Amides of Creatine, Method of Their Preparation, and Remedy Possessing a Neuroprotective Activity" (the "Patent"). D.E. 28. The Patent was duly and lawfully issued by the United States Patent and Trademark Office ("USPTO") on January 8, 2013. D.E. 46-1.

Plaintiff, Werteks Closed Joint Stock Company, d/b/a Werteks Pharmaceutical Company ("Werteks"), is the owner of the Patent. D.E. 28 ¶ 16. Plaintiff, ThermoLife International, LLC ("ThermoLife"), exclusively licenses the Patent from Werteks, and has been given the right by Wertex to institute the instant action (Werteks and ThermoLife shall, collectively, be referred to as "Plaintiffs"). *See id.* ¶¶ 17-18. Plaintiffs allege that Defendant, Vital Pharmaceuticals, Inc. ("Defendant" or "VPX"), manufactures and markets dietary supplemental products under the "CREmTOR" brand name, which Plaintiffs contend infringes on the Patent. *Id.* ¶¶ 21-26.

Plaintiffs assert a claim for patent infringement under each of the three claims of the Patent. Claim 1 provides that "[t]he invention claimed is:"

> **Amides of Creatine having a general formula: NH==C(NH2)-N(CH3)-CH2-CO—NH—R\*X**, wherein R is amino acid residue of aliphatic L-amino acid, or aromatic amino L-acid or heteroaromatic L-amino acid or derivatives of aliphatic L-amino acid, or aromatic L-amino acid or heteroaromatic L-amino acid representing at least one of the following: salts of amino acid, amino acid esters, amino acid amides, or amino acid peptides; and **X is low-molecular weight organic or mineral acid or water.**

D.E. 46-1 at col. 16 lines 35-44 (emphasis added). Claim 2 provides that "[t]he invention claimed is:"

> A method for preparation of said amides of Creatine according to claim **1**, said method comprising: interaction of amides of sarcosine and amino acids

or their derivatives with guanidinylating agents in an organic solvents at a
temperature not exceeding 50º C.

*Id.* at col. 16 lines 45-50 (emphasis in original). Claim 3 provides that "[t]he invention claimed

is:"

> A compound possessing neuroprotective activity, said compound consisting
> of: **amides of Creatine having a general formula: NH==C(NH2)-**
> **N(CH3)-CH2-CO—NH—R*X;** wherein R is amino acid residue of
> aliphatic L-amino acid, or aromatic amino L-acid or heteroaromatic L-
> amino acid, or derivatives of aliphatic L-amino acid, or aromatic L-amino
> acid, or heteroaromatic L-amino acid representing at least one of the
> following: salts of amino acid, amino acid esters, amino acid amides, or
> amino acid peptides; **and X is low-molecular-weight organic or mineral**
> **acid or water** <u>as a remedy possessing a neuroprotective activity.</u>

*Id.* at col. 16 lines 51-60 (emphasis added).

The parties dispute only one term in this action: "**X is a low-molecular weight organic**

**or mineral acid or water**."  D.E. 43 p. 1 (emphasis added). The parties' proposed constructions

of the term are as follows:

| Plaintiffs' Proposed Claim Construction of "X is low-molecular-weight organic or mineral acid or water" | Defendant's Proposed Claim Construction of "X is low-molecular-weight organic or mineral acid or water" |
|---|---|
| "Water" refers to degrees of hydration, and hydrate systems can be classified from anhydrous, where the coefficient that is implicit in "X" would be zero, to higher degrees of hydrates, where the coefficient would be greater than zero. | The term "X is low-molecular-weight organic or mineral acid or water" requires that that X **must be** one molecule of "low-molecular weight organic or mineral acid or water." "X" therefore cannot be equal to zero molecules of low-molecular-weight organic or mineral acid or water. |

D.E. 43 p. 2.

II.    **Legal Standard**

In a case involving patents, claim construction is a matter of law exclusively within the province of the Court. *Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 372 (1996). "The duty of the trial judge is to determine the meaning of the claims at issue and to instruct the jury accordingly." *Exxon Chem. Patents, Inc. v. Lubrizoil Corp.,* 64 F.3d 1553, 1555 (Fed. Cir. 1995) (internal citations omitted). "Claims of the patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.,* 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*) (internal citations omitted). "Because the patentee is required to 'define precisely what his invention is,' it is 'unjust to the public, as well as an evasion of the law, to construe it in a manner different from the plain import of its terms.'" *Id.* (internal citations omitted).

Words of a claim are generally given their ordinary and customary meaning. *Id.* The "ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention" and a court must, therefore, determine "how a person of ordinary skill in the art understands a claim term." *Id.* A "person of ordinary skill in the art is deemed to read the claim term not only in context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.*

When a claim term has a particular meaning in the field of art, the court must examine those sources available to the public to show what a person skilled in the art would have understood disputed claim language to mean. *Id.* at 1314. Those sources "include 'words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic

evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.'" *Id.* (internal citations omitted).

"[T]he ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* However, "[b]ecause the meaning of a claim term as understood by persons of skill in the art is often not immediately apparent, and because patentees frequently use terms idiosyncratically, the court looks to those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean." *Id.*

Claim language should not be interpreted in a vacuum. Rather, claim language is construed as "part of a fully integrated written instrument, consisting principally of a specification that concludes with the claims." *Id.* at 1315 (citing *Markman*, 52 F.3d at 978). For that reason, claims "must be read in view of the specification, of which they are a part . . . and the specification is always highly relevant to the claim construction analysis." *Id.* (internal citation and quotations omitted). The specification is usually "dispositive" and is the "single best guide to the meaning of a disputed term." *Id.* (citing *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

The patent prosecution history is, in some cases, "of primary significant in understanding the claims." *Markman*, 52 F.3d at 980. But while "the prosecution history can and should be used to understand the language used in the claims, it too cannot 'enlarge, diminish, or vary' the limitations in the claims." *Id.* (internal citations omitted).

Lastly, a court may consider extrinsic evidence, such as dictionaries, inventor testimony, and learned treatises, but their use should be limited. *Phillips*, 415 F.3d at 1317, 1319. While extrinsic evidence in the form of expert testimony "can be useful to a court for a variety of purposes, such as to provide background on the technology at issue, to explain how an invention works, to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field," conclusory, unsupported assertions by experts as to the definition of a claim term are not useful. *Phillips*, 415 F.3d at 1318 (collecting cases). Importantly, a court must also discount any expert testimony "that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history, in other words, with the written record of the patent." *Key Pharm. v. Hercon Labs. Corp.*, 161 F.3d 709, 716 (Fed. Cir. 1998). While at times useful, "extrinsic evidence is considered less significant than the intrinsic evidence" and should not be relied on where ambiguities can be resolved based on intrinsic evidence alone. *White Water Investments, Inc. v. Ethicon Endo-Surgery, Inc.*, No. 04-81178-CIV, 2005 WL 6258668, at *3 (S.D. Fla. Sept. 1, 2005) (citing *Phillips*, 415 F.3d at 1317); *Vitronics Corp.*, 90 F.3d at 1583.

## III.  Discussion

The parties dispute the following claim language: "X is a low-molecular weight organic or mineral acid or water."[1] D.E. 43 p. 1. Plaintiffs propose the following construction of the disputed claim term: "'Water' refers to degrees of hydration, and hydrate systems can be

---

[1] As discussed above, "X" is a variable in the following incorporated into each of the Patent's three claims: "Amides of Creatine having a general formula: NH==C(NH2)-N(CH3)-CH2-CO—NH—R*X." D.E. 46-1 at col. 16 lines 35-44, 51-60.

classified from anhydrous, where the coefficient that is implicit in 'X' would be zero, to higher degrees of hydrates, where the coefficient would be greater than zero." D.E. 43 p. 2. In contrast, Defendant proposes the following construction of the disputed claim term: "The term 'X is low-molecular-weight organic or mineral acid or water' requires that that X **must be** one molecule of 'low-molecular weight organic or mineral acid or water.' 'X' therefore cannot be equal to zero molecules of low-molecular-weight organic or mineral acid or water." *Id.* (emphasis in original).

In other words, Defendant argues that "X" necessarily requires exactly one molecule of low-molecular-weight organic or mineral acid or water; in contrast, Plaintiffs contend that "X" means the *possible* presence of low-molecular-weight organic or mineral acid, or water, where X could be zero (i.e., no organic or mineral acid or water) or any number greater than zero.

The parties briefed the issue and submitted extrinsic evidence in advance of the *Markman* hearing which included, in relevant part: (1) the Declaration of Dr. Richard Chamberlin in Support of Plaintiffs' Claim Construction Brief (the "First Chamberlin Declaration"), D.E. 46-2; (2) the Declaration of Dr. Richard Chamberlin in Support of Plaintiffs' Response to Defendant's Claim Construction Brief (the "Second Chamberlin Declaration"), D.E. 59-1; (3) the Declaration of Dr. Gregg B. Fields in Support of VPX's Claim Construction Brief (the "Fields Declaration"), D.E. 47-2; (4) dictionary definitions of "is" and "be" from Webster's II New College Dictionary (Third Ed., 2005), D.E. 47-1 pp. 57-61; (5) U.S. Patent No. 6,777,397, U.S. Patent No. 7,329,307, U.S. Patent No. 7,393,466.and U.S. Patent No. 7,157,071; and (6) excerpts from the December 28, 2016 deposition of Dr. Chamberlin, including an article by Dr. Chamberlin used by Defendant's counsel at the deposition, D.E. 72, 72-1, 72-2, 73-2.

At the January 4, 2017 *Markman* hearing, the Court heard additional argument from the parties and, following the hearing, permitted Plaintiffs to file a supplemental memorandum attaching: (1) additional excerpts from the December 28, 2016 deposition of Dr. Chamberlin; and (2) the complete *Moinet* patent, U.S. Patent No. 6,518,458, which is relevant to the patent prosecution history and which both parties urge the Court to consider in ruling on claim construction. D.E. 73. The Court has considered all of the intrinsic and extrinsic evidence submitted in this case.

The Court will begin by summarizing the parties' arguments and, then, rule on claim construction.

A. The Parties' Arguments

i. *Defendant's arguments*

Defendant argues that the plain language of the claim, the specification, the prosecution history and extrinsic evidence all support its proposed claim construction.

With respect to the plain language of the claim, Defendant presents three arguments. First, Defendant relies on the phrase "X is . . ." and the definition of "is" from the Merriam-Webster II New College Dictionary to contend that the use of the phrase "is" requires low-molecular-weight organic or mineral acid or water to "exist in actuality" in the compound represented by the general formula: NH==C(NH2)-N(CH3)-CH2-CO—NH—R*X. D.E. 47 pp. 11-12. Second, Defendant argues that well-established patent claim construction case law holds that claim language in the form of "X is A, B, or C" is a *Markush* group signifying that X *must be* A, B, or C and cannot—as Plaintiffs argue—indicate either the presence or absence of A, B, or C. *Id.* pp. 12-14. Because the disputed claim language is in "A, B or C" format, Defendant

argues that "X" *must* include low-molecular-weight organic or mineral acid or water. *Id.* Lastly, Defendant relies on language in Claim 3 providing: "X is low-molecular-weight organic or mineral acid or water <u>as a remedy possessing a neuroprotective activity</u>." *Id.* p. 14 (emphasis added). Defendant argues that if X could be zero, then X would not be a "remedy possessing neuroprotective activity" and, therefore, argues that the Court should reject Plaintiffs' attempt to "read[] a necessary element (i.e., "X is . . .") out of the claim." *Id.* p. 14.

Defendant also argues that the patent specification supports its proposed claim construction. As an initial matter, Defendant argues the "Abstract" and "Detail Description of the Invention" sections include the same *Markush* group language as the claims themselves. D.E. D.E. 47 pp. 14-15. Moreover, Defendant argues that each of the examples in the patent specification involve the synthesis of compounds that have as their "X" component either low-molecular-weight organic or mineral acid or water and, therefore, do not have "nothing" as the "X." D.E. 47 pp. 14-15. And at the *Markman* hearing, after questioning from the Court, Defendant relied on the "Detail Description of the Invention," D.E. 46-1 col. 4 lines 19-23, to contend that the specification plainly states that "X" is a necessary element of Claims 1, 2 and 3 because the "X" serves the purpose of facilitating deployment of amides of Creatine with enhanced solubility and stability in aqueous solutions. Tr. at 51:12-52:18.

In addition, Defendant contends that the patent prosecution history supports its proposed claim construction. In May 2012, the Patent Examiner rejected the claims in the patent application at issue in this action due to anticipation by a prior patent, *Moinet*, U.S. Patent No. 6,518,458. D.E. 47-1 pp. 65-66. The inventors of the patent thereafter filed a "Response to Office Action & Amendment" (the "ROAA"), arguing that *Moinet* could not anticipate the claims at

issue due to the import of the "R" coefficient in the prosecuted patent's claims, which is defined, in relevant part, as: "R*X; wherein R is amino acid residue of aliphatic L-amino acid, or aromatic amino L-acid or heteroaromatic L-amino acid, or derivatives of aliphatic L-amino acid, or aromatic L-amino acid, or heteroaromatic L-amino acid representing at least one of the following: salts of amino acid, amino acid esters, amino acid amides, or amino acid peptides." *Id.* p. 67.

The ROAA stated: "[t]he main substantial difference of the present invention from Moinet is that the claimed compound comprises an amino acid residue R of one of the following amino acids . . . whereas Moinet does not disclose any amino acid residue neither expressly, nor impliedly, nor inherently." *Id.* In other words, the ROAA emphasized that "[i]n order to anticipate the present invention, radicals R2 and R3 of Moinet's compound have to include one of the" compounds in the "R is A, B, or C clause." *See id.*; D.E. 47 pp. 16-17. Defendant contends that because the ROAA construed "R" as a *Markush* group, whereby the proposed patent *required* the presence of "A, B or C" when prosecuting the patent, Plaintiffs should be precluded from taking the opposite position in this case with respect to the "X" variable. D.E. 47 p. 17.

Lastly, based on extrinsic evidence, Defendant argues that the use of "*X" by a person of ordinary skill in the art of organic and peptide chemistry would not allow the "X" to be zero, but would instead require that "X" be **one** molecule of low-molecular-weight organic or mineral acid or water. In particular, Defendant rejects Plaintiff's argument that there is an implied coefficient "n" in front of the "X" under ordinary principles of chemistry and, instead, argues that "X" indicates **one** molecule of "X" (i.e., low-molecular-weight organic or mineral acid or water). *Id.*

p. 17. In support thereof, Defendant relies on the declaration of Dr. Gregg Fields, an assortment of other U.S. Patents that include chemicals bonded with H2O and, at the *Markman* hearing, relied on excerpts from the December 28, 2016 deposition of Plaintiffs' expert, Dr. Richard Chamberlin. D.E. 47, 60.

ii. *Plaintiffs' arguments*

Plaintiffs argue that the claim language, specification, prosecution history and extrinsic evidence support their proposed claim construction. In support thereof, Plaintiffs rely primarily on: (1) case law allegedly rebutting Defendant's claim that "X" should be construed as a *Markush* group; (2) the patent specification; (3) the prosecution history; and (4) testimony from Dr. Chamberlin, including two declarations filed on his behalf as well as excerpts from Dr. Chamberlin's December 28, 2016 deposition. D.E. 46-2, 59-1, 73-2.

In their briefing and at the *Markman* hearing, Plaintiffs argued that "X" should not be construed as a *Markush* group because a *Markush* group requires "the requisite signaling language: 'selected from the group consisting of,'" which is not included in the Patent. D.E. 59 p. 9, n. 6; Tr. 63:24-66:21.

With respect to the patent specification, Plaintiffs rely on the "Detail Description of the Invention" section of the patent specification, which provides, in relevant part:

> Creatine amides can be administered into the organism independently and within compositions, containing a mixture of an active ingredient with auxiliary components. The auxiliary components are substances permitted by the Pharmacopoeia; they enhance the conditions of preparation, storage, or administering the remedy, for instance . . . the auxiliary substances may include: solvents, such as water . . . .

D.E. 46-1 col. 5, lines 1-12. Plaintiffs argue that this language shows that the compound described in the claims as "Amides of Creatine having a general formula: NH==C(NH2)-

11

N(CH3)-CH2-CO—NH—R*X" is generic enough to include an anhydrous compound, or a compound without any water indicated by the "X" variable, which is then mixed with water. D.E. 59 p. 6. Because there is no chemical difference between a "hydrated form of a compound and an anhydrous form of that same compound once they are dissolved in water," Plaintiffs argue that "X" can denote "either an anhydrous form of a compound of a hydrated form of that same compound." *Id.* pp. 6-8.

Moreover, Plaintiffs argue that the prosecution history is dispositive in resolving claim construction in their favor, for two reasons. First, Plaintiffs rely on the following diagram in the ROAA, which was provided to the Patent Examiner by the inventors of the patent at issue in this action, Sergej Vladimirovich Burov, Natalia Vasilyevna Khromova, Anna Alexandrovna Khromova and Petr Alekseevich Khromov[2]:

> The general formula of the claimed Amides of Creatine can be structurally represented as follows:

D.E. 47-1 p. 67 (the "Prosecution Diagram"). Plaintiffs argue that this "general formula of the claimed Amides of Creatine," as illustrated by the Inventors, does not include a low-molecular-

---

[2] The inventors of the patent at issue in this action, Sergej Vladimirovich Burov, Natalia Vasilyevna Khromova, Anna Alexandrovna Khromova and Petr Alekseevich Khromov, were the patent applicants who submitted the aforementioned ROAA. D.E. 47-1 p. 63; D.E. 1-5. Werteks thereafter acquired the Patent and licensed it to ThermoLife. *See* D.E. 28 ¶¶ 17-18. To avoid confusion, the Court will refer to the patent applicants as the "Inventors."

weight organic or mineral acid or water, thereby conclusively showing that "X" can indicate either the presence or absence of an organic or mineral acid or water. D.E. 59 pp. 2-4.

Second, Plaintiffs argue that the ROAA's focus on the "R" coefficient, rather than the "X" coefficient, indicates that the general formula of Amides of Creatine, as defined by the Patent, is broad enough to include an anhydrous compound. D.E. 59 pp. 4-6. In particular, Plaintiffs argue that the Inventors "could have argued that 'X' must be an acid or water and that *Moinet's* disclosure is distinguishable because the reference does not disclose a salt (in which 'X' is an acid) or a hydrate (in which 'X' is water)," but elected not to do so. *Id.* p. 4. Plaintiffs construe the Inventors' decision to prosecute the patent based on the "R" coefficient, rather than the "X" coefficient, as a strategic decision to make an argument generic enough to embrace an interpretation of "X" as indicating *either* the presence *or* absence of low-molecular-weight organic or mineral acid or water. *Id.* pp. 4-5; Tr. at 19:2-25.

Lastly, Plaintiffs argue that extrinsic evidence shows that a person skilled in the art of chemistry would understand, consistent with the Inventors' Prosecution Diagram, that there is a coefficient "n" implicit in the "X" in the general formula, which could be zero or any coefficient greater than zero. D.E. 46 pp. 4-5; 59 pp. 2-3, 8-9. In support thereof, Plaintiffs rely on the First Chamberlin Declaration, the Second Chamberlin Declaration, and excerpts of Dr. Chamberlin's testimony from his December 28, 2016 deposition. *Id.*; D.E. 73.

B.  <u>Analysis</u>

The Court adopts Defendant's proposed claim construction based on the plain claim language, patent specification, and, to a lesser degree, patent prosecution history and expert testimony of Dr. Fields and Dr. Chamberlin, used to "assist in determining the meaning or scope

of technical terms in the claims." *Pall Corp. v. Micron Separations, Inc.*, 66 F.3d 1211, 1216 (Fed. Cir. 1995); *see also Phillips*, 415 F.3d at 1312 ("The inquiry into how a person of ordinary skill in the art understands a claim term provides an objective baseline from which to begin claim interpretation . . . [i]mportantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification.").

   i. *Claim language*

   As an initial matter, the plain language of the phrase "X is a low-molecular-weight organic or mineral acid or water" indicates that low-molecular weight organic or mineral acid or water must actually be present in the chemical compound having a general formula: $NH==C(NH2)-N(CH3)-CH2-CO—NH—R*X$, for three principal reasons. First, the plain meaning and dictionary definition of the word "is" indicates, absent patent language or specifications to the contrary, that "X" must actually be present. *Merriam Webster II New College Dictionary* (Third Ed., 2005) (defining "is" as the present tense of "be" and "be" as to "exist in actuality"); *see also Mission Pharmacal Co. v. Virtus Pharm., LLC*, No. SA-13-CA-176-OG, 2014 WL 12480013, at *17 (W.D. Tex. Feb. 26, 2014), *report and recommendation adopted*, No. 5:13-CA-176-OLG, 2014 WL 12480014 (W.D. Tex. Mar. 28, 2014) (construing claim term "to be" to mean "will occur in a future state"); *Phillips*, 415 F.3d at 1322 ("[J]udges are free to consult dictionaries and technical treatises . . . when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents."); *see also Vitronics Corp.*, 90 F.3d at 1585 (noting that dictionaries may be relied on as "more objective and reliable" forms of extrinsic evidence).

Second, language in Claim 3 concerning "neuroprotective activity" supports the conclusion that low-molecular-weight organic or mineral acid or water must, in fact, be present to satisfy the general formula for amides of Creatine. Claim 3 provides that the invention claimed is:

> A compound possessing neuroprotective activity, said compound consisting of: **amides of Creatine having a general formula: NH=C(NH2)—N(CH3)—CH2—CO—NH—R*X**; wherein R is amino acid residue of aliphatic L-amino acid, or aromatic amino L-acid or heteroaromatic L-amino acid, or derivatives of aliphatic L-amino acid, or aromatic L-amino acid, or heteroaromatic L-amino acid representing at least one of the following: salts of amino acid, amino acid esters, amino acid amides, or amino acid peptides; **and X is low-molecular-weight organic or mineral acid or water** <u>as a remedy possessing a neuroprotective activity.</u>

D.E. 46-1 at col. 16, lines 51-60 (emphasis added). If "water" could indicate *either* absence *or* presence of water, then the phrase "as a remedy possessing a neuroprotective activity" in Claim 3 would be rendered meaningless. Because Plaintiffs' proposed construction would, in effect, eliminate the language in Claim 3 concerning a "remedy possessing a neuroprotective activity," it must be rejected. *See, e.g.*, *Merck & Co. v. Teva Pharm. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so."); *see also K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1363 (Fed. Cir. 1999) (rejecting claim construction "that would effectively expunge the term 'permanently' from the claim language").

Lastly, "X" is properly construed as a *Markush* group format under well-established patent law, which supports Defendant's proposed construction. "A Markush group is a listing of specified alternatives of a group in a patent claim, typically expressed in the form: a member selected from the group consisting of A, B, and C." *Abbott Labs. v. Baxter Pharm. Prod., Inc.*,

334 F.3d 1274, 1280 (Fed. Cir. 2003). While a "Markush claim is commonly formatted as: 'selected from the group consisting of A, B, and C' . . . the phrase 'Markush claim' means any claim that recites a list of alternatively useable species regardless of format." U.S. Dept. of Commerce, Patent and Trademark Offices, *Manual of Patent Examining Procedure* § 2173.05(h). Accordingly, "[w]hen materials recited in a claim are so related as to constitute a proper Markush group, they may be recited in the conventional manner, or alternatively." *In re Harnisch*, 631 F.2d 716, 723 (C.C.P.A. 1980); *Abbot Labs*, 334 F.3d at 1280. "For example, if 'wherein R is a material selected from the group consisting of A, B, C and D' is a proper limitation then 'wherein R is A, B, C or D' shall also be considered proper." *Id.*

Here, the disputed language provides that "X is low-molecular-weight organic or mineral acid or water," thereby creating a *Markush* group requiring that either low-molecular-weight organic or mineral acid or water be present. *See Abbot Labs*, 334 F.3d at 1283 ("To prove literal infringement of these claims on remand, Abbott must show a species selected from the members of the recited Markush group is present in Baxter's sevoflurane composition in an amount effective to function as a Lewis acid inhibitor."); *see also Application of Driscoll*, 562 F.2d 1245, 1249 (C.C.P.A. 1977) (noting that *Markush* groups are used in the "practice of describing a class of chemical compounds in terms of a structural formula").

    ii. *Patent specification*

The patent specification also supports Defendant's proposed claim construction. *See also Medrad, Inc. v. MRI Devices Corp.,* 401 F.3d 1313, 1319 (Fed. Cir. 2005) ("We cannot look at the ordinary meaning of the term . . . in a vacuum. Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history."); *Unitherm Food Sys., Inc.*

*v. Swift–Eckrich, Inc.,* 375 F.3d 1341, 1351 (Fed. Cir. 2004) (proper definition is the "definition that one of ordinary skill in the art could ascertain from the intrinsic evidence in the record").

As an initial matter, Defendant's expert, Dr. Fields, states in his declaration—and Plaintiffs concede—that each of the eight examples of chemical compounds in the patent specification include either low-molecular-weight organic or mineral acid or water. D.E. 47-2 ¶¶ 35-38; Tr. 4:23-5:9. While the examples in the patent specifications are, by the Patent's own terms, only "illustrat[ive]," the fact that each of the eight examples of chemical compounds in the patent specification include the presence of one of the alternative compounds represented by "X" is consistent with the plain claim language requiring the presence of low-molecular-weight organic or mineral acid or water. D.E. 46-1 col. 5, line 28; D.E. 47-2 ¶¶ 35-38; Tr. 4:23-5:9; *IP Innovation LLC v. Mitsubishi Elec. Corp.*, No. 08 C 393, 2009 WL 3617505, at *5 (N.D. Ill. Oct. 29, 2009) (adopting plaintiffs' proposed construction where the "[p]atent specification provides a range of examples consistent with this construction"); *DE Techs., Inc. v. Dell, Inc.*, No. CIV.A. 704CV00628, 2006 WL 335608, at *3 (W.D. Va. Feb. 14, 2006), *amended in part*, No. CIV.A. 704CV00628, 2006 WL 733967 (W.D. Va. Mar. 21, 2006) (refusing to broaden claim term where plain claim language and "illustrative examples" both "consistently referr[ed] to the invention" in a narrower way).

There is also substantial language in the "Background of the Invention," "Object and Brief Description of the Invention" and "Detail Description of the Invention" sections of the patent specification to indicate that claims at issue here encompass a "general formula of Amides of Creatine" with "enhanced solubility and stability in aqueous solutions," *perhaps* as a result of the "X" coefficient. D.E. 46-1 col. 2, lines 41-45 ("Therefore preparation of Creatine derivatives

possessing a greater stability or higher biological activity represents a big interest that allows, on the one hand, reducing the dose of administered substance and, on the other hand, finding new fields of application therefor."), col. 3, lines 49-55 ("Therefore, a primary object of the present invention is the obtaining of novel Creatine derivatives produced through chemical synthesis, which derivatives should possess a higher stability and a wider spectrum of biological actions, in particular, the neuro-protective activity."), col. 4, lines 19-23 ("As it was determined during biological experiments, synthesized amides of Creatine have an enhanced solubility and stability in aqueous solutions in comparison will well-known analogues that allows deploying them more widely as a source of Creatine in the organism."); Tr. 51:12-52:22.

While neither party has submitted evidence to explicitly support the proposition that the "X" coefficient exists to facilitate enhanced solubility and stability in aqueous solutions, Defendant's counsel represented this to be the case at the *Markman* hearing and, more importantly, such a conclusion is supported by Dr. Fields' declaration, which states that "X" is a "necessary molecule of the formula claimed in claims 1 and 3 because it is set forth in the formula preceded immediately by an asterisk" and, therefore, "must be one molecule of one of the specified alternative compounds (low-molecular-weight organic or mineral acid or water) which is "non-covalently bonded within the claimed compound." D.E. 47-2 ¶¶ 17-22. Consistent with the patent specification, Defendant's counsel's representation and Dr. Fields' declaration, the Court therefore interprets the Patent to encompass an amide of Creatine whose general formula requires the presence of one of the alternative compounds indicated by the "X" variable, at least in part because the "X" variable serves *some* purpose in the claimed chemical compound. *See, e.g.*, *Phillips*, 415 F.3d at 1318 (permitting courts to consider extrinsic evidence "for a

variety of purposes, such as to provide background on the technology at issue, to explain how an invention works, to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field"). Accordingly, the Court rejects Plaintiffs' argument that the "X" variable is mere surplusage because this conclusion contravenes the "words of the claims themselves [and] the remainder of the specification" and, therefore, finds that the presence of one of the alternative compounds represented by "X" is a necessary and claimed component of "Amides of Creatine having a general formula: NH==C(NH2)-N(CH3)-CH2-CO—NH—R*X."[3] *Id.* at 1312.

iii. *Prosecution history*

Despite the parties' competing arguments to the contrary, the Court concludes that the patent prosecution history and *Moinet* patent have little impact on claim construction. The patent application at issue, patent application, No. 17/734,183, was filed on April 15, 2010. D.E. 47-1 p. 63. In May 2012, the Patent Examiner rejected each of the claims in the proposed patent, under 35 U.S.C. § 102(b), on grounds that such claims were anticipated by the prior *Moinet* patent,

---

[3] The Court also rejects Plaintiffs' argument that language in the "Detail Description of the Invention" concerning "auxiliary components" indicates that "X" is optional because: (1) one of the "auxiliary components" is water; and (2) there is no chemical difference between a "hydrated form of a compound and an anhydrous form of that same compound once they are dissolved in water." *See* D.E. 59 p. 6; D.E. 46-1 col. 5, lines 1-12. The section relied on by Plaintiffs sets forth a number of different "auxiliary substances" that can be used to "administer[] [Creatine amides] into the organism." D.E. 46-1 col. 5 lines 1-2. However, these auxiliary substances are, by the Patent's own terms, only "exemplar[y]." *Id.* at col. 5, line 11. After reading the language concerning "auxiliary compounds" in conjunction with the remainder of the Patent, the Court finds that this section only sets forth examples of different ways to ingest the "Amides of Creatine having a general formula: NH==C(NH2)-N(CH3)-CH2-CO—NH—R*X" and does not, as Plaintiffs argue, serve to broaden the plain meaning of the "X" variable. *See, e.g.*, *Phillips*, 415 F.3d at 1312 (requiring that courts construe a claim term by interpreting the term "in the context of the entire patent").

U.S. Patent No. 6,518,458. *Id.* p. 66. On September 5, 2012, the Inventors filed their ROAA in response to the Patent Examiner, requesting that the Examiner reconsider and amend the application. In particular, the Inventors contended that the claims in the proposed patent were not anticipated by *Moinet* by arguing, in relevant part, that:

> The main substantial difference of the present invention from Moinet is that the claimed compound comprises an amino acid residue of R of one of the following amino acids: aliphatic L-amino acid, or aromatic amino L-acid or heteroaromatic L-amino acid or derivatives of aliphatic L-amino acid, or aromatic L-amino acid or heteraromatic L-amino acid, **whereas Moinet does not disclose any amino acid residue neither expressly, nor impliedly, nor inherently.**

D.E. 47-1 p. 67. The Inventors further emphasized that "[i]n order to anticipate the present invention, radicals R2 and R3 of Moinet's compound have to include one of the following structures (as radical R of the present invention does)," and thereafter included drawings of chemical structures related to the definition of the "R" variable under the proposed '077 patent. *Id.*

In other words, the Inventors contested that the prosecuted patent was anticipated by *Moinet* by drawing distinctions between the pharmaceutical composition patented in *Moinet* and the chemical compound represented by the equation $NH{=}{=}C(NH2){-}N(CH3){-}CH2{-}CO{-\!-}NH{-\!-}R*X$ based on the "R" variable, which is defined as "amino acid residue of aliphatic L-amino acid, or aromatic amino L-acid or heteroaromatic L-amino acid or derivatives of aliphatic L-amino acid, or aromatic L-amino acid or heteroaromatic L-amino acid representing at least one of the following: salts of amino acid, amino acid esters, amino acid amides, or amino acid peptides." D.E. 47-1 pp. 67-69; D.E. 46-1 col. 16 lines 51-62. And after considering the ROAA, the Patent Examiner issued its Notice of Allowability based entirely on the "R" variable, stating:

"Rejection of claims 1-3 under 35 USC 102/103 over Moinet et al are hereby withdrawn, because the reference fails to teach R* to be amino acid residue." D.E. 47-1 p. 74.

Because the prosecution history hinged entirely on the "R" variable and did not address the "X" variable, prosecution history is not particularly helpful in construing the meaning of "X" in Claims 1, 2 and 3 of the Patent.[4] *See, e.g.*, *Gen. Am. Transp. Corp. v. Cryo-Trans, Inc.*, 93 F.3d 766, 770 (Fed. Cir. 1996) (resolving claim construction based on claim language and patent specification where "[t]he prosecution history is brief and not helpful to resolving the meaning of the disputed claim language"); *see also* Tr. 18:3-19:25. At best, it is weak support for Defendant's contention that "X" is expressed as a *Markush* group.

    iv. *Extrinsic evidence*

With respect to extrinsic evidence, as noted above, the Court exercises its discretion to consider portions of the declaration of Dr. Fields, D.E. 47-2 ¶¶ 17-22, as helpful in determining the "meaning or scope of technical terms in the claims" and, in particular, to understand: (1) whether the examples in the patent specification contain low-molecular-weight organic or mineral acid or water; and (2) the Patent's apparent intent to patent a compound with "enhanced solubility and stability in aqueous solutions," based on the general formula $NH=C(NH_2)-N(CH_3)-CH_2-CO—NH—R*X$, which includes the presence of one of the alternative compounds represented by the variable "X." *Supra* pp. 17-19; *Phillips*, 415 F.3d at 1319 ("[B]ecause extrinsic evidence can help educate the court regarding the field of the invention and can help the court determine what a person of ordinary skill in the art would understand claim terms to mean,

---

[4] The Court, therefore, declines to reach the parties' arguments concerning: (1) whether Dr. Chamberlin, as an expert, properly opined on the prosecution history; and (2) whether the Prosecution Diagram in the ROAA, D.E. 46-3 p. 69 ¶ 5, accurately described "the general formula of the claimed Amides of Creatine." *See* D.E. 46-3 p. 69 ¶ 5.

21

it is permissible for the district court in its sound discretion to admit and use such evidence."). But the remaining portions of Dr. Fields' declaration, besides those cited above, are not helpful in interpreting the scope of the patent claims at issue here. *Phillips*, 415 F.3d at 1317 ("However, while extrinsic evidence can shed useful light on the relevant art, we have explained that it is less significant than the intrinsic record in determining 'the legally operative meaning of claim language." (internal citations and quotations omitted)).

The Court has also considered the remaining extrinsic evidence submitted by the parties, including the First Chamberlin Declaration, the Second Chamberlin Declaration, excerpts from Dr. Chamberlin's December 28, 2016 deposition, and the six unrelated patents filed by Defendant, D.E. 60-1 pp. 4-66. For the following reasons, the Court does not find the aforementioned extrinsic evidence to be helpful.

As an initial matter, the Court finds Dr. Chamberlin's testimony that "X" could "refer to any degree of hydration, including zero" to be unpersuasive for three reasons. D.E. 59-1 ¶ 9. First, Dr. Chamberlin's testimony concerning the Prosecution Diagram in the Response to Office Action & Amendment, submitted in response to the Patent Examiner's denial of the patent application at issue based on anticipation by the *Moinet* patent, even if it were to be considered proper expert testimony, has no bearing on claim language pertaining to the variable "X" because the patent prosecution hinged on the meaning of the "R" variable and not the "X" variable. *Supra* pp. 19-21; *see* D.E. 46-2 ¶ 7.

Second, Dr. Chamberlin's testimony concerning whether amides of Creatine can exist in "anhydrous form or hydrated form" without "substantially alter[ing] their function, the way they achieve that function, or the results they achieve" is unpersuasive because of the claim language

and extensive language in the patent specification to indicate that "Amides of Creatine having a general formula NH==C(NH2)-N(CH3)-CH2-CO—NH—R*X" requires the presence of one of the three alternative compounds represented by the variable "X." D.E. 46-1 col. 2, lines 19-23, 41-45, 49-55; Tr. 51:12-52:22; D.E. 47-2 ¶¶ 18-22.

Third, Dr. Chamberlin's testimony that the "X" is "entirely optional" based on an implied coefficient "n" is, similarly, unconvincing because it is "clearly at odds with the claim construction mandated by the claims themselves [and] the written description . . . in other words, with the written record of the patent." D.E. 59-1 ¶¶ 12-20; *Key Pharm.*, 161 F.3d at 716 ("What is disapproved of is an attempt to use extrinsic evidence to arrive at a claim construction that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history, in other words, with the written record of the patent.").

In addition, the six unrelated patents filed by Defendant are irrelevant because these *other* patents were drafted in different contexts than the instant Patent and, possibly, for different purposes, and therefore neither impact the Court's interpretation of the plain claim language nor "have the specification's virtue of being created at the time of patent prosecution for the purpose of explaining the patent's scope and meaning." *Phillips*, 415 F.3d at 1318.

## IV.    <u>Conclusion</u>

For these reasons, the Court adopts Defendant's proposed claim construction. The term "X is a low-molecular weight organic or mineral acid or water" in Claims 1 and 3, which is also incorporated into Claim 2, shall be construed as follows: The term "X is low-molecular-weight organic or mineral acid or water" requires that X **must be** one molecule of "low-molecular

weight organic or mineral acid or water." "X" therefore cannot be equal to zero molecules of low-molecular-weight organic or mineral acid or water. Accordingly, it is

ORDERED AND ADJUDGED that United States Patent No. 8,350,077 shall be construed as described above.

DONE AND ORDERED in Chambers at Miami, Florida, this _12TH__ day of January, 2017.

_____
URSULA UNGARO
UNITED STATES DISTRICT JUDGE

copies provided to: counsel of record

24